UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHAEL CARTER, WILLIAM RUSSELL, RICH-ARD A. BILLMAN, SR., ODIS LONG, PAUL A. BEATY, and RICHARD W. ALDRICH,<br>            *Plaintiffs*, | )<br>)<br>)<br>)<br>) | 1:14-cv-00564-JMS-MJD |
| *vs.* | )<br>) | |
| GENERAL MOTORS HOURLY-RATE PENSION PLAN and GENERAL MOTORS LLC,<br>            *Defendants*. | )<br>)<br>)<br>) | |

## ORDER

Presently pending in this case brought under the Employee Retirement Income Security

Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA") are: (1) a Motion for Summary

Judgment filed by Plaintiffs Michael Carter, William Russell, Richard Billman, Sr., Odis Long,

Paul Beaty, and Richard Aldrich, [Filing No. 54]; and (2) a Motion for Summary Judgment filed

by Defendants General Motors Hourly-Rate Pension Plan (the "GM Plan") and General Motors

LLC ("GM"),[1] [Filing No. 60].  The Court held a hearing on the motions on June 18, 2015.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because

there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear,

---

[1] Although General Motors Corporation is the party to several relevant agreements, the Court will use the acronym "GM" for both General Motors Corporation and General Motors LLC.  General Motors Corporation was dissolved in 2011, and General Motors LLC assumed sponsorship and administration of the GM Plan.  [Filing No. 61-1 at 2; Filing No. 61-3.]  The parties use the acronym "GM" for both entities, and Defendants do not dispute that General Motors LLC is the proper defendant here, as administrator of the GM Plan.

whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 202 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d

903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003). Specifically, "[p]arties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." *Id.* at 648.

## II.
### BACKGROUND

The Court finds the following to be the undisputed facts, supported by proper citation to admissible evidence in the record:

### A. The GM Plan

Prior to 2007, Allison Transmission, Inc. ("Allison") was a division of GM. [Filing No. 54-15 at 1.] During that time, Plaintiffs were employees of Allison, members of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW"), and participants in the GM Plan, which provides pension benefits for employees who

have attained age 65, cease employment with GM, and meet certain requirements, and for employ-
ees who meet certain criteria for early retirement.  [Filing No. 54-14 at 36-37.]

### B.  The Memorandum of Understanding

In 2007, GM sold Allison – excluding its Baltimore operations and Indianapolis Electric
Drives/Castleton Tech Center – to Clutch Operating Company, Inc. ("Clutch").[2]  [Filing No. 54-
15 at 1; Filing No. 61-1 at 2.]  On June 29, 2007, GM, Clutch, and the UAW entered into a Mem-
orandum of Understanding ("MOU") that was intended to resolve issues relating to the transition
of hourly UAW-represented employees from positions at the GM-owned Allison ("GM-Allison")
to the Clutch-owned Allison ("Clutch-Allison").  [Filing No. 54-15 at 1-2 ("it is the intent of the
parties, and the purpose of this Memorandum and the attached Special Minutes (which are incor-
porated herein) to resolve those GM-UAW and [Clutch] UAW issues concerning the transition of
hourly UAW represented Transferred Employees from Allison to Clutch Operating Company,
Inc., and for the transition of hourly UAW represented Transferred Employees from Clutch Oper-
ating Company, Inc. to GM").]

The MOU provides:

2. EMPLOYMENT WITH CLUTCH OPERATING COMPANY, INC.
   a.  GM's contract with [Clutch] provides that, as of the Effective Date,
[Clutch] will employ all active hourly represented Allison employees.

*         *         *

3. SENIORITY
   [Clutch] will assume the GM seniority status of Transferred Employees for
purposes of continued employment with [Clutch] and seniority standing under the
[Clutch]-UAW Agreement.

---

[2] Clutch Operating Company, Inc. changed its name to Allison Transmission, Inc. in 2007, [Filing
No. 54-16 at 1], but the Court will still refer to Clutch Operating Company, Inc. as "Clutch" to
avoid confusion.

4. STATUS WITH GM

     Upon [Clutch's] assuming the GM seniority status of Transferred Employees on the Effective Date, their status with GM will be on "indefinite layoff" with rights as defined in this Memorandum.

*     *     *

7. PENSION

     a.1. GM's contract with [Clutch] provides that [Clutch] will establish a new defined benefit GM Pension Plan (hereinafter referred to as the "Replacement Pension Plan"), effective as of the Effective Date of the transaction, covering all Transferred Employees which, consistent with [Clutch's] obligations under the Clutch Operating Company, Inc.-UAW Agreement, will contain terms identical to the GM Pension Plan except for those provisions required to be changed as a result of a new Plan sponsor and the provisions addressed in this Memorandum.  The intent of the parties is to provide Transferred Employees with benefits from the Replacement Pension Plan and the GM Pension Plan which, apart from any difference that may result from future bargaining, in aggregate, will equal the benefits that would have been provided had the transaction not occurred and the employees had continued working for GM.  GM's contract with [Clutch] will provide that the Replacement Pension Plan will also provide….the following:

     a.2. Recognition of credited service accrued under the GM Pension Plan as of the Effective Date of the transaction for vesting but not for accrual purposes, except for employees who retire on or before the first day of the month following the expiration of the 2007 GM-UAW National Agreement or return to GM on or before the first day of the month following the expiration of the 2007 GM-UAW National Agreement.  In such cases, [Clutch] will transfer assets to GM associated with the pension liability that GM will assume.  The Replacement Pension Plan will also recognize for accrual purposes credited service accrued under the GM Pension Plan for any employee with unbroken seniority at Allison as of the Effective Date of the transaction who is not vested in the GM Pension Plan as of such Effective Date.

     a.3.  Pro-rata share shall mean an amount based on a percentage of the number of years of credited service accrued (including fractional years) under the Replacement Pension Plan divided by the total years of credited service under both the GM Pension Plan and the Replacement Pension Plan as of the date of retirement from [Clutch] or GM.

     a.4. All hourly employees with unbroken seniority at Allison as of the Effective Date, who are vested in the GM Pension Plan as of the Effective Date who retire from Allison on a Normal or Early Voluntary or Total and Permanent Disability (approved by GM) basis after the first day of the month following the expiration of the 2007 GM-UAW National Agreement, shall be entitled to payment from the Replacement Pension Plan, of an amount equal to a pro-rata share of the total benefit that would be payable under the Replacement Pension Plan determined

- 5 -

by taking into account solely for eligibility for payment (but not for the determina-
tion of the amount of payment) the credited service accrued under the GM Pension
Plan as of the Effective Date of the transaction.  The payment will include a Basic
benefit (reduced for age where appropriate) for each year of credited service ac-
crued under the Replacement Pension Plan, and any applicable supplement in an
amount equal to the difference between the basic benefit and the pro-rata share of
the total benefit.

*   *   *

b.1. The GM Pension Plan will be amended to provide as set forth in 7.b.2.
through 7.b.10., the following:

b.2. The GM Pension Plan shall recognize, for both accrual and eligibility
purposes, credited service accumulated under the Replacement Pension Plan for
any hourly employees with unbroken seniority at Allison on the Effective Date of
the transaction, who are eligible to i) retire on a Normal or Early Voluntary or Total
and Permanent Disability (approved by GM) basis under the GM Pension Plan and
retire from [Clutch] on or before the first day of the month following the expiration
of the 2007 GM-UAW National Agreement or ii) return to work at GM on or before
the first day of the month following the expiration of the 2007 GM-UAW National
Agreement.  Further, the GM Pension Plan shall only recognize [Clutch] credited
service in an amount equal to the credited service actually accrued under the Re-
placement Pension Plan prior to the first day of the month following the expiration
of the 2007 GM-UAW National Agreement and no credited service shall be recog-
nized for any period for which the GM Pension Plan has already provided credited
service.

*   *   *

b.4.  All GM Pension Plan benefit rates will be those rates in effect as of the
date of retirement from Clutch Operating Company, Inc.  All other GM Pension
Plan terms shall apply, including but not limited to the discontinuation of benefit
payments upon death, an award of Social Security Disability Insurance benefits,
cessation of pension benefits for other reason, re-employment by GM or attainment
of age 62 and 1 month.

[Filing No. 54-15 at 5-8.]

## C.   Plaintiffs' Requests for GM Plan Benefits and GM's Denials

The parties do not dispute that in 2007, Plaintiffs were all qualified for either normal or

early retirement from GM.  After GM sold GM-Allison to Clutch, however, Plaintiffs all continued

- 6 -

employment with Clutch-Allison.[3]   [Filing No. 54-15 at 3.]  In late 2013 or early 2014, they each

requested to retire from GM and to begin receiving GM Plan benefits, but to continue their em-

ployment with Clutch-Allison.  [Filing No. 54-1 at 2; Filing No. 54-2 at 5; Filing No. 54-3 at 7;

Filing No. 54-4 at 6; Filing No. 54-5 at 6; Filing No. 54-6 at 5.]  GM sent letters to each Plaintiff,

setting forth the reasons why they were not entitled to GM Plan benefits while continuing to work

for Clutch-Allison.  [Filing No. 54-1 at 1; Filing No. 54-2 at 1-2; Filing No. 54-3 at 1-2; Filing No.

54-4 at 8-10; Filing No. 54-5 at 1-2; Filing No. 54-6 at 1-2.]  On October 4, 2013, GM sent Mr.

Carter a letter which stated:

> Per Plan provisions, the Participant must terminate from the Plan to receive their
> pension benefits under the General Motors [Plan]….[Participants] who are part of
> a divestiture are allowed to commence their General Motors pension benefits only
> after the Participant terminate[s] from the divestiture company.  Our records indi-
> cate that you are still active under the Allison Transmission (ATI).  Consequently,
> you are not eligible to commence your pension benefits until you terminate from
> the ATI.

[Filing No. 54-4 at 8.]

GM sent Mr. Aldrich and Mr. Beaty substantially the same letter on November 8, 2013 and

November 11, 2013, respectively, which stated:

> This letter is in response to your recent inquiry to the GM Benefits & Services
> Center regarding benefit commencement.  You are currently employed with Allison
> Transmission/Clutch Operating Company, Inc.  In order to commence your GM
> pension benefit, you must terminate from the divested and/or successor company.

[Filing No. 54-1 at 1 (letter to Mr. Aldrich); Filing No. 54-2 at 8 (letter to Mr. Beaty).]

---

[3] Plaintiffs represent that, as Clutch-Allison employees, they are also entitled to participate in a
separate Allison Pension Plan, but state that the Allison Pension Plan "is not at issue in this suit."
[Filing No. 56 at 2.]  Plaintiffs confirmed at the hearing that the separate Allison Pension Plan is,
in fact, the "Replacement Pension Plan" referred to in the MOU.

Subsequently, GM sent substantially the same denial letter to each Plaintiff, which stated:

This letter is in response to your recent inquiry to the GM Benefits & Services Center regarding when you can initiate your retirement under the General Motors Hourly-Rate Pension Plan, "the Plan".

Article IX, Section 4 of the Plan provides as follows: "From time to time the Company and the Union may enter into Memoranda of Understanding, the provisions of which address issues under the Plan associated with the divestiture, purchase or other disposition of specific operations. Such provisions are made part of this Plan as if set out fully herein."

Under Section 4 of the Memorandum of Understanding (MOU) dated June 29, 2007, signed by General Motors, the UAW, and Clutch Operating Company, employees of Allison Transmission had their status at GM changed to Indefinite Layoff as of the date of the sale. Specifically the MOU states: "Upon Clutch Operating Company, Inc.'s assuming the GM seniority status of Transferred Employees on the Effective Date, their status with GM will be on "indefinite layoff" with rights as defined in this Memorandum."

This layoff status provided hourly employees with certain rights with respect to their benefit treatment. Employees who were part of the divestiture do not break their service with GM until they separate from the divestiture. By retaining these rights, the GM Plan recognizes service accrued by an employee while working at the divestiture for eligibility purposes. The agreement further specified that GM will use the benefit rates in effect as of the date of retirement or termination from Clutch Operating Company in the calculation of the GM Basic benefit.

Finally, Article VII, Section 1(a)(2) of the Plan states: "The first monthly payment of an employee's pension other than for total and permanent disability shall become payable with the employee's consent on the first day of the month following the month in which the employee actually retires…"…

Based on these terms in the Plan and the MOU, employees at ATI may not receive their GM benefits until they terminate or retire from ATI.

[Filing No. 54-1 at 6-7 (letter to Mr. Aldrich); Filing No. 54-2 at 1-2 (letter to Mr. Beaty); Filing No. 54-3 at 1-2 (letter to Mr. Billman; Filing No. 54-4 at 5 (letter to Mr. Carter); Filing No. 54-5 at 1-2 (letter to Mr. Long, Jr.); Filing No. 54-6 at 1-2 (letter to Mr. Russell) (emphasis in originals).]

### D.    The Lawsuit

Plaintiffs initiated this lawsuit on April 11, 2014, [Filing No. 1], and filed an Amended Complaint on September 10, 2014, [Filing No. 39].  Plaintiffs assert two claims against GM and the GM Plan: (1) wrongful denial of benefits under ERISA Section 502(a)(1)(B); and (2) equitable relief under ERISA Section 502(a)(3)(A).  [Filing No. 39 at 5-6.][4]  While not entirely clear from their Complaint or briefs, Plaintiffs clarified at the June 18, 2015 hearing that they are seeking benefits under the GM Plan for the time they worked at GM-Allison, which they allege ended in 2007 upon the sale of Allison to Clutch, including interest on those payments.  They also clarified their belief that they will then only be entitled to benefits under the Allison Pension Plan upon retirement from Clutch-Allison for the years worked at Clutch-Allison.  Plaintiffs have moved for summary judgment on all of their claims, [Filing No. 54], and Defendants have cross-moved for summary judgment on those claims, [Filing No. 60].

### III.
### STANDARD OF REVIEW AND APPLICABLE LAW FOR PLAN DETERMINATIONS UNDER ERISA

"Judicial review of an ERISA administrator's benefits determination is de novo unless the plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L.Ed.2d 80 (1989)).  Here, the parties have stipulated that the standard of review for Plaintiffs' claims is *de novo*, [Filing No. 49], and the Court will honor that stipulation.  As the Seventh Circuit has explained:

---

[4] Mr. Carter also asserted a claim against GM for failure to provide requested documents under ERISA, [Filing No. 39 at 4-5], but subsequently accepted an Offer of Judgment from GM on that claim, [*see* Filing No. 53].

The district court's task in engaging in *de novo* consideration of the decision of the plan administrator is not the same as its job in reviewing administrative determinations on the basis of the record the agency compiled under the substantial evidence rule, as it might do in a Social Security benefits case….Some of the confusion in this area may be attributable to the common phrase "*de novo* review" used in connection with ERISA cases.  In fact, in these cases the district courts are not *reviewing* anything; they are making an independent decision about the employee's entitlement to benefits.  In the administrative arena, the court normally will be required to defer to the agency's findings of fact; when *de novo* consideration is appropriate in an ERISA case, in contrast, the court can and must come to an independent decision on both the legal and factual issues that form the basis of the claim.  What happened before the Plan administrator or ERISA fiduciary is irrelevant….That means that the question before the district court [is] whether [plaintiff] was entitled to the benefits he sought under the plan….

*Diaz v. Prudential Ins. Co. of America*, 499 F.3d 640, 643 (7th Cir. 2007) (emphasis in original).

Accordingly, the Court will determine, based on the evidence, whether Plaintiffs are entitled to the benefits they seek, and Plaintiffs have the burden of proof.  *Ruttenberg v. U.S. Life Ins. Co. in City of New York*, 413 F.3d 652, 663 (7th Cir. 2005) (party that seeks to enforce benefits under an ERISA plan has the burden of proving entitlement to those benefits).

Federal common law applies to the interpretation of an ERISA plan.  *Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 911 (7th Cir. 2013); *see also Mathews v. Sears Pension Plan*, 144 F.3d 461, 465 (7th Cir. 1998) ("[T]he relevant principles of contract interpretation are not those of any particular state's contract law, but rather are a body of federal common law tailored to the policies of ERISA").  Federal common law "draws on general principles of contract interpretation, at least to the extent that those principles are consistent with ERISA."  *Schultz v. Aviall, Inc. Long Term Disability Plan*, 670 F.3d 834, 838 (7th Cir. 2012).

Under federal common law, courts are directed to "interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience."  *Brewer v. Protexall, Inc.*, 50 F.3d 453, 457 (7th Cir. 1995).  Additionally, "the plan must be read as a whole, considering

separate provisions in light of one another and in the context of the entire agreement….All lan-

guage of a plan should be given effect without rendering any term superfluous." *Schultz*, 670 F.3d

at 838.

Plan language is ambiguous "if it is susceptible to more than one reasonable interpretation."

*Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 873 (7th Cir. 2001). Where the language is not ambigu-

ous, the Court "will not look beyond [the plan's] 'four corners' in interpreting its meaning.'" *Id.*

If ambiguities exist, however, the Court may consider undisputed extrinsic evidence to aid in its

interpretation. *Anstett v. Eagle-Picher Industries, Inc.*, 203 F.3d 501, 503 (7th Cir. 2000).

## IV.
### DISCUSSION

Plaintiffs argue that they are eligible for benefits under the GM Plan because:

- The MOU does not change their rights under the GM Plan because it is not part of the GM Plan;

- Clutch-Allison is not a "successor company" under the terms of the GM Plan or, at the very least, the term "successor company" is ambiguous and should be construed in their favor; and

- No other provisions in the GM Plan affect their eligibility for GM Plan benefits.

[Filing No. 56; Filing No. 67; Filing No. 69.] Defendants dispute each of these arguments, and

also assert that they are entitled to summary judgment on both Plaintiffs' claim for payment of

benefits under the GM plan and Plaintiffs' alternative claim for equitable relief. [*See* Filing No.

61; Filing No. 68; Filing No. 73.] The Court will address each issue in turn.

### A.  Plaintiffs' Claim for Benefits

#### 1.  *Whether the MOU is Part of, or Amends, the GM Plan*

Plaintiffs argue that the MOU does not amend the GM Plan because there was never an

"amended plan" document, the GM Plan and the MOU do not adequately specify how the GM

Plan is amended, and the MOU "does not make clear whether or which original GM Plan provisions are deleted, amended, or replaced in whole or in part, and repeatedly re-incorporates all 'other' GM Plan provisions – again without specificity as to which provisions, in whole or in part, are at issue." [Filing No. 56 at 10-11.]  Accordingly, Plaintiffs argue, the GM Plan "is now hopelessly unclear and patently ambiguous as to Plaintiffs," and any ambiguity should be construed in Plaintiffs' favor.  [Filing No. 56 at 11.]

Defendants respond that the GM Plan "expressly contemplates that GM and the UAW will execute Memoranda of Understanding from time to time to deal with pension issues secondary to divestitures and other operational transactions," and the GM Plan states that such memoranda are automatically incorporated into the GM Plan by reference.  [Filing No. 61 at 22.]  Defendants point to language in the MOU that they argue clearly defines how it alters the GM Plan, and argue that the MOU is a plan document.  [Filing No. 61 at 23.]

Plaintiffs reply that while the MOU may be a plan document, it does not "validly amend" the GM Plan and that, even if it did, it does not change the GM Plan provisions which establish their eligibility for benefits.  [Filing No. 67 at 15 (emphasis omitted).]  Plaintiffs argue that the MOU does not limit their ability to terminate their GM status and begin receiving benefits under the GM Plan.  [Filing No. 67 at 16.]  They reiterate that the MOU does not sufficiently define how it amends the GM Plan, and argue that the GM Plan was restated four years after the MOU took effect and did not reflect any of the amendments created by the MOU.  [Filing No. 67 at 16-17.] Plaintiffs contend that the MOU "addresses benefits only upon termination from Clutch/Allison, recognizes the possibility of separate retirement from GM, and leaves benefits upon retirement from GM as fully described in the GM Plan."  [Filing No. 67 at 17.]

Defendants again argue in their reply that the MOU is a valid Plan document by incorporation, but also assert that the Court need not rely upon the MOU because the GM Plan itself provides that former employees who transfer to a divested successor company must terminate employment with the successor company to break service and retire.  [Filing No. 68 at 5-6.]  Defendants assert that the MOU intentionally does not address what happens when an employee retires from GM without terminating from Clutch-Allison because an employee cannot retire from GM without also terminating from Clutch-Allison.  [Filing No. 68 at 6.]

The GM Plan, as it existed in June 2007 when the UAW, Clutch, and GM entered into the MOU, provides:

> From time to time the Corporation and the Union may enter into Memoranda of Understanding, the provisions of which address issues under the Plan associated with the divestiture, purchase or other disposition of specific operations.  Such provisions are made a part of this Plan as if set out fully herein.

[Filing No. 54-12 at 9.][5]

The Court finds that the MOU is part of the GM Plan, based on the terms of the GM Plan itself.  There is nothing ambiguous about the GM Plan's provision, which specifically states that GM and the Union may enter into Memoranda of Understanding and that the provisions set forth in such Memoranda are "made a part" of the GM Plan.  [Filing No. 54-12 at 9.]

Plaintiffs argue that while the MOU may purport to amend the GM Plan, it does not "validly" do so because it does not "adequately specify how the GM Plan is supposedly amended" and there is not an "amended plan" document that specifies how the GM Plan is amended.  [Filing No. 56 at 10.]  But Plaintiffs point only to one out-of-circuit case to support their argument that a plan amendment must indicate "exactly how it would alter the plan."  [Filing No. 56 at 10-11.]  That

---

[5] Subsequent versions of the GM Plan contain this same provision.  [Filing No. 54-13 at 104 (September 26, 2007 GM Plan); Filing No. 54-14 at 113 (September 16, 2011 GM Plan).]

case – *Coffin v. Bowater Inc.*, 501 F.3d 80 (1st Cir. 2007) – involved a Stock Purchase Agreement that the First Circuit Court of Appeals found did not amend or terminate an ERISA plan because the language of the Stock Purchase Agreement did not clearly indicate that it was doing so, and the plan itself remained in place.  Conversely, the MOU here specifically states that "it is the intent of the parties, and the purpose of this [MOU]…to resolve those GM-UAW and [Clutch] UAW issues concerning the transition of hourly UAW represented Transferred Employees from Allison to [Clutch], and for the transition of hourly UAW represented Transferred Employees from [Clutch] to GM."  [Filing No. 54-15 at 1-2.]  The MOU goes on to discuss Clutch-Allison's establishment of a "Replacement Pension Plan" which will "contain terms identical to the GM Pension Plan except for those provisions required to be changed as a result of a new Plan sponsor and the provisions addressed in this [MOU]."  [Filing No. 54-15 at 5.]  The MOU may not have "amended" the GM Plan, but it became part of the Plan under the language of the GM Plan itself and acted as a bridge for transferred employees such as Plaintiffs from GM-Allison to Clutch-Allison without interruption to their pension benefits.

Having found that the MOU is part of the GM Plan, the Court now looks to the specific language of the GM Plan and the MOU to determine whether Plaintiffs are entitled to benefits without retiring from Clutch.

### 2.   Whether Clutch-Allison is a "Successor Company"

There has been considerable give and take among the parties regarding whether Clutch-Allison is a "successor company," with six different briefs addressing the issue.  [*See* Filing No. 56; Filing No. 61; Filing No. 67; Filing No. 68; Filing No. 69; Filing No. 73.]  In sum, Plaintiffs argue that a provision in the GM Plan requiring an employee to terminate employment with a "successor company" does not bar their claim for benefits because Clutch is not a successor to GM

(in its entirety), or alternatively that Clutch does not qualify as a successor under relevant case law.

Defendants argue that Clutch is a successor under the terms of the GM Plan, and that this conclusion is reinforced by the language of the MOU. Defendants also distinguish the cases on which Plaintiffs rely. Accordingly, the Court will analyze the terms of the GM Plan and the MOU to determine whether the successor provision applies here.

a. The Plan Language

The successor provision in the GM Plan states that:

Notwithstanding any other provision of this Section 1, the payment of pension benefits under this Plan to an employee or former employee **who has accepted employment with a successor company through a sale, divestiture or joint venture transaction**, cannot commence under this Plan until such employee has terminated employment with the successor company or in accordance with Section 1(e) immediately above.

[Filing No. 54-14 at 99 (emphasis added).]

It is undisputed that the GM Plan does not define "successor company," and the parties disagree as to its meaning – Plaintiffs think it means a successor to GM which, in their view, could only mean GM's actual successor, Motors Liquidation Company; Defendants maintain it means Clutch-Allison, which purchased Allison from GM.

Plaintiffs argue that Clutch-Allison did not assume the GM Plan, and has not "completely replaced" GM.  [Filing No. 56.] [6]  But Plaintiffs do not point to any authority which stands for the principle that Clutch-Allison must have assumed liability under the GM Plan and "completely replaced" GM in order for it to be considered a successor company.  Plaintiffs cite *Markham v. Prutsman Mirror Co.*, 565 N.E.2d 385 (Ind. Ct. App. 1991), for the proposition that a company is a successor "only when [the] predecessor corporation no longer exists."  [Filing No. 56 at 13; Filing No. 67 at 14.]  *Markham* is inapposite, however, because it involved a company that did not assume any of the prior company's liabilities.  *Id.* at 387.  As Defendants observe, the *Markham* Court also noted that successors of corporate assets can be considered corporate successors when "the purchaser assumes liability; or the transaction amounts to a consolidation or merger;…or when the purchaser is merely a continuation of the seller."  *Id.*  Here – unlike the company in *Markham*, which did not incur any liabilities of the original company, *Id.* – Clutch assumed "the applicable terms of the 2003 GM-UAW National Agreement," and acquired "substantially all of the assets and liabilities of [GM]…under an Asset Purchase Agreement…."  [Filing No. 54-15 at 1; Filing No. 61-1 at 2.]

---

[6] Plaintiffs argue that the term "successor company" should be construed in their favor under the doctrine of *contra preferentem* because "[w]hile Plaintiffs may be represented by a union that collectively bargained the GM Plan, the Plaintiffs themselves were not involved in the bargaining process, and certainly were not made privy to any negotiation surrounding the term 'successor company', if such negotiation ever occurred….Further, there is no evidence in the record that the MOU is collectively bargained."  [Filing No. 67 at 27.]  The Court rejects Plaintiffs' argument. The MOU provides that the UAW is "the certified collective bargaining representative for [the Transferred Employees, including Plaintiffs]" as of the closing date of the sale of Allison to Clutch. [Filing No. 54-15 at 1.]  The UAW is tasked with representing Plaintiffs in negotiations such as the negotiations that resulted in the MOU.  The MOU provided many benefits to Plaintiffs, including continued employment at Allison despite GM's sale of that business to Clutch, and continued accrual of seniority under the GM Plan.  Plaintiffs cannot now disavow their reliance on the UAW to represent their interests, simply because the end-result is not what they now would prefer.

- 16 -

The Court also finds instructive the Seventh Circuit's analysis of whether a company is a "successor" in the context of a labor relations dispute, where it noted that the following factors are relevant: "[a] there has been a substantial continuity of the same business operations; [b] the new employer uses the same plant; [c] the same or substantially the same work force is employed; [d] the same jobs exist under the same working conditions; [e] the same supervisors are employed; [f] the same machinery, equipment, and methods of production are used; and [g] the same product is manufactured or the same service [is] offered…." *N.L.R.B. v. Jarm Enterprises, Inc.*, 785 F.2d 195, 200 (7th Cir. 1986). Plaintiffs have not presented any evidence showing that Clutch-Allison was not comprised of the same employees as GM-Allison, working the same jobs, at the same location, and using the same machinery and equipment, and was not producing the same products as GM-Allison. Indeed, the undisputed evidence establishes otherwise. Clutch-Allison's position as a "successor company" to GM is supported by this common sense interpretation of the phrase in the labor relations context. *See also Feeko v. Pfizer, Inc.*, 2014 WL 6473265, *7-8 (E.D. Pa. 2014) ("successor company" was not defined in ERISA plan, but administrator's interpretation that it included company that had acquired company which originally employed plaintiffs was reasonable, especially in light of Severance Plan's stated purpose to "provide certain employees…with benefits that will assist them with their transition during and following a Change in Control").

As noted, the successor provision specifically refers to an employee accepting employment with a successor company through a "sale, divestiture or joint venture transaction…." [Filing No. 54-14 at 99.] In other words, the company that results from a sale, divestiture or joint venture transaction – here, Clutch-Allison – is a "successor company." "Divestiture" is defined as "[t]he loss or surrender of an asset or interest," *Black's Law Dictionary* 512 (8th ed. 2004), and this is

- 17 -

precisely what took place when GM sold Allison (save for a few parts) to Clutch. The Court finds that Clutch-Allison is a "successor company" within the meaning of the successor provision. The successor provision refers to "a successor company," not "GM's successor." It provides that a successor can arise "through divestiture." And Plaintiffs, who have the burden of demonstrating that they are entitled to benefits under the GM Plan, have not pointed to any authority which supports their narrow reading of that term to include only GM's successor. Plaintiffs' reading incorporates a limitation that simply is not there. Accordingly, under the plain terms of the GM Plan, Plaintiffs must terminate employment with Clutch-Allison, the successor company, in order to begin receiving benefits under the GM Plan. [Filing No. 54-14 at 99.] Any other interpretation of the GM Plan would render the successor company provision meaningless.

b. The MOU Language

Plaintiffs emphasized at the June 18, 2015 hearing their argument that the MOU does not affect their entitlement to GM Plan benefits because they are not retiring from Clutch-Allison – in other words, they argue that the MOU language only kicks in upon retirement from Clutch-Allison. The Court rejects this argument. The MOU's stated purpose is to "resolve those GM-UAW and [Clutch] UAW issues concerning the transition of hourly UAW represented Transferred Employees from Allison to [Clutch]…." [Filing No. 54-15 at 1.] Plaintiffs are the "Transferred Employees" referred to in the MOU, and the language of the MOU must be read in tandem with the GM Plan language. So, while the Court has found that the successor company provision in the GM Plan alone unambiguously precludes Plaintiffs from recovering under the GM Plan until they retire from Clutch-Allison, it will also consider language in the MOU which, as discussed below, bolsters the Court's conclusion that Plaintiffs must cease employment with Clutch-Allison before they can receive GM Plan benefits.

- 18 -

First, the intent of GM, Clutch, and the UAW, as reflected in the MOU, is relevant. The

Court finds particularly significant the following language in the MOU, which provides that:

> The intent of the parties is to provide Transferred Employees with benefits from the Replacement Pension Plan and the GM Pension Plan which, apart from any difference that may result from future bargaining, in aggregate, will equal the benefits that would have been provided had the transaction not occurred and the employees had continued working for GM.

[Filing No. 54-15 at 5.]  This language shows that GM, Clutch, and the UAW intended to provide

Allison employees with a seamless transition from GM to Clutch, while continuing their same

position at Allison with the same benefits.

The MOU also provides that:

> All hourly employees with unbroken seniority at Allison as of the Effective Date, who are vested under the GM Pension Plan as of such date and retire from [Clutch] on a voluntary basis after the first day of the month following the expiration of the 2007 GM-UAW National Agreement, shall be entitled to **payment from the GM Pension Plan, upon retirement from [Clutch] of an amount equal to a pro-rata share of the total benefit that would be payable under the GM Pension Plan, determined as if the employee were then retiring from GM on a Normal or Early Voluntary basis or a disability retirement (if approved by GM) and by taking into account solely for eligibility for payment (but not for the determination of the amount of payment) the additional credited service actually accrued under the Replacement Pension Plan for service with [Clutch] after the Effective Date.**

[Filing No. 54-15 at 8 (emphasis added).]  It defines "Pro-rata share" as "an amount based on a

percentage of the number of years of credited service accrued…under the GM Pension Plan di-

vided by the total years of credited service under both the GM Pension Plan and the Replacement

Pension Plan as of the date of termination from [Clutch-Allison] or GM."  [Filing No. 54-15 at 8.]

This language is another indication of GM's and Clutch's intent for Allison employees to receive

benefits seamlessly, paid for by both GM and Clutch according to how many years the employee

worked for GM-Allison and Clutch-Allison.  Were employees allowed to retire from GM and

begin receiving benefits under the GM Plan, but be allowed to continue working for Clutch-Allison, they would be receiving a benefit to which they were not originally entitled under the GM Plan – commencement of pension benefits while still employed by Clutch-Allison. Additionally, were Plaintiffs allowed to receive benefits under the GM Plan now, and continue working for Allison, Defendants would not be able to determine the GM Plan's pro-rata share of the benefits owed. Calculation of that share is dependent on the total years of credited service at both GM-Allison and Clutch-Allison – a figure which is not known until Plaintiffs, in fact, cease employment with Clutch-Allison.[7]

Additionally, the MOU provides that "[a]ll GM Pension Plan benefit rates will be those rates in effect as of the date of retirement from [Clutch-Allison]." [Filing No. 54-15 at 8.] Like the pro-rata share provision, determination of the rates for GM Plan benefits is dependent on when Plaintiffs cease employment with Clutch-Allison. Defendants would not know at what rate Plaintiffs benefits should be calculated under the GM Plan if they were allowed to receive those benefits now, because they are not ceasing employment with Clutch-Allison.

The Court also notes the provision in the MOU which places all transferred employees on "indefinite layoff" status with GM. *See* Filing No. 54-15 at 3 ("Upon [Clutch's] assuming the GM seniority status of Transferred Employees on the Effective Date, their status with GM will be on 'indefinite layoff' with rights as defined in this MOU".] This language, coupled with the "successor company" provision in the GM Plan, indicates an intent to prevent transferred employees from

---

[7] The Court requested in advance of the June 18, 2015 hearing that the parties be prepared to set forth a hypothetical calculation of its version of the benefits Plaintiffs are seeking. Plaintiffs' counsel submitted calculations at the end of her presentation, but objected when Defendants' counsel submitted calculations on behalf of Defendants. In light of Plaintiffs' objection, the Court has not considered any of the parties' hypothetical calculations in making its decision on the motions for summary judgment.

retiring from GM while continuing employment with Clutch-Allison.  Indeed, as Plaintiffs point

out, the MOU does not address the situation where an employee continues employment at Clutch-

Allison, but retires from GM.  This omission is not a shortcoming or ambiguity, but rather an

indication that that situation is not permitted.[8]

### 3.  Conclusion on Plaintiffs' Claim for Benefits

"One of ERISA's purposes is to protect the financial integrity of pension and welfare plans

by confining benefits to the terms of the plans as written…." *Pohl v. National Benefits Consult-*

*ants, Inc.*, 956 F.2d 126, 128 (7th Cir. 1992); *see also Grammer v. Aetna Life Ins. Co.*, 286 Fed.

Appx. 947, 949 (7th Cir. 2008) ("[o]ne of ERISA's primary purposes is to ensure the integrity of

written plans, and thus we must confine [plaintiff's] benefits to the terms of the plan as written").

Plaintiffs' reading of the GM Plan and the MOU is convoluted, and would not promote the integrity

of the GM Plan because it would render portions of it, and of the MOU, meaningless which is

contrary to controlling precedent.  *See Schultz*, 670 F.3d at 838 ("All language of a plan should be

given effect without rendering any term superfluous")  Specifically, Plaintiffs request that the

Court conclude the MOU is not part of the GM Plan – a conclusion which contradicts clear lan-

guage in the GM Plan itself – and that Clutch-Allison is not a successor company – a conclusion

which goes against the plain meaning of that term.  If Plaintiffs wanted to receive their GM Plan

benefits in 2007, they could have retired from GM-Allison, collected benefits, and continued to

---

[8] Plaintiffs point to internal GM documents to argue that GM did not believe Clutch-Allison was
a successor company, and did not intend it to be so.  [*See, e.g.*, Filing No. 56 at 16-17.]  Under the
*de novo* standard of review, the Court will interpret the four corners of the GM Plan documents
"without deferring to either party's interpretation."  *Bock v. Computer Associates Intern., Inc.*, 257
F.3d 700, 704 (7th Cir. 2001).  In any event, Defendants advised Plaintiffs from the beginning of
the claims process that they could not receive GM Plan benefits until they terminated employment
with Clutch-Allison.  [*See, e.g.*, Filing No. 54-1 at 1; Filing No. 54-2 at 16.]  The Court does not
find Defendants' position before the lawsuit was filed to be inconsistent with their position now
or with the language of the GM Plan.

work elsewhere.  By choosing to work for Clutch-Allison – and to receive the benefits the UAW negotiated for them as reflected in the MOU[9] – Plaintiffs gave up any entitlement to GM Plan benefits until they cease employment with Clutch-Allison.  The GM Plan language, bolstered by the MOU, mandates that result.  Because it is undisputed that Plaintiffs have not terminated employment with Clutch-Allison, their request for benefits under the GM Plan is premature and they are not entitled to those benefits until such termination occurs.

### B.  Plaintiffs' Equitable Claim

Plaintiffs bring a claim under Section 502(a)(3)(A) of ERISA, 29 U.S.C. § 1132(a)(3)(A), for "equitable relief…to enforce their rights under the [GM] Plan."  [Filing No. 39 at 6.]  29 U.S.C. § 1132(a)(3)(A) provides that a plan participant may bring a civil action "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan…."

Defendants argue that Plaintiffs have not shown any violation of ERISA, and also that because Plaintiffs have a claim for denial of benefits, they cannot also assert an equitable claim. [Filing No. 61 at 28.]  Plaintiffs do not specifically address their equitable claim in their briefs.

Because the Court has concluded that Plaintiffs are not entitled to benefits under the GM Plan until they terminate employment with Clutch-Allison, Plaintiffs have not shown that Defendants violated ERISA or the terms of the GM Plan such that they are entitled to equitable relief under 29 U.S.C. § 1132(a)(3)(A).  Accordingly, their claim for equitable relief under ERISA fails as a matter of law.

---

[9] For example, Plaintiffs state in their reply brief that they are entitled to "GM benefit rate increases because they are not breaking service – their indefinite layoff status – with GM, until now." [Filing No. 67 at 20.]  So, they are seeking to take advantage of rate increases earned by virtue of their indefinite layoff status provided for in the MOU, and negotiated for on their behalf by the UAW, but at the same time they have argued that the MOU does not apply to them because they have not yet terminated employment with Clutch-Allison.

## V.
### CONCLUSION

Based on its *de novo* review of the Administrative Record, the Court finds that Plaintiffs have not been wrongly denied benefits under the GM Plan because they have not terminated employment with Clutch-Allison.  Additionally, Plaintiffs are not entitled to equitable relief under ERISA.  Accordingly, for the foregoing reasons, Plaintiffs' Motion for Summary Judgment, [Filing No. 54], is **DENIED** and Defendants' Motion for Summary Judgment, [Filing No. 60], is **GRANTED**.  Final judgment will enter accordingly.


June 23, 2015

_____

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana


**Distribution via ECF only to all counsel of record**


- 23 -